This Opinion is a
Precedent of the TTAB

Oral Hearing Held On: July 9, 2019          Mailed: February 26, 2020

### UNITED STATES PATENT AND TRADEMARK OFFICE

——

### Trademark Trial and Appeal Board

——

*Hanscomb Consulting, Inc.*
*v.*
*Hanscomb Limited*

——

Concurrent Use No. 94002720

——

H. Jay Spiegel of H. Jay Spiegel & Associates, for
Hanscomb Consulting, Inc.

Thomas A. O'Rourke of Bodner & O'Rourke, LLP, for
Hanscomb Limited.

——

Before Wellington, Heasley, and Pologeorgis,
Administrative Trademark Judges.

Opinion by Wellington, Administrative Trademark Judge:

Hanscomb Consulting, Inc. ("HCI"), in the position of plaintiff in this proceeding,

seeks a concurrent use registration of the composite mark



(CONSULTING disclaimed) on the Principal Register

for

> "business consultation, particularly in the fields of estimating contract
> work, business and economic feasibility studies and data

> analysis/dissemination, cost analyses, project risk management, negotiation and settlement of commercial transactions for third parties, scheduling services, cost assessment services; project management services for others for business purposes in the fields of architecture, engineering interior design and urban planning design"

in International Class 35.[1] HCI filed its application on July 12, 2016 and claims first use of the mark anywhere and in commerce as of July 11, 2013. HCI seeks registration of its mark for the services "throughout the United States of America with the exception of the following geographical areas: 1) Within zip code 60521 in Hinsdale, IL; and 2) Within zip code 90071 in Los Angeles, CA."

HCI concedes in its application that its use of HANSCOMB is not exclusive; that Hanscomb Limited ("HL") is the owner of an application (Serial No. 86644350, filed May 28, 2015) to register the mark HANSCOMB in standard characters for identical services;[2] and that HL "may have established common law rights in [the geographic areas defined by Illinois and California zip codes] for its use of the service mark HANSCOMB in association with services similar to those of [HCI]." However, HCI contends in its application that HL "has no rights to the mark HANSCOMB beyond those limited geographical areas."

HL filed its application prior to HCI's filing date and claims use dates earlier than those claimed by HCI. While HL's earlier filing date might have led to HL's application being noted as a prior pending application and potential bar to

---

[1] Application Serial No. 87100385.

[2] Application Serial No. 86644350 is based on a claim of first use of the mark anywhere and in commerce as of January 1, 2000, and a claim that the mark has acquired distinctiveness pursuant to Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f). On October 4, 2016, the application was published for opposition. No opposition was filed.

registration for HCI during prosecution, HCI's acknowledgment in its application that HL was an exception to HCI's rights and its allegation of first use before HL's filing date meant the USPTO could approve HCI's concurrent use application for publication for opposition. *See* TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1207.04(c) (October 2018). When the Office did so, HL filed a notice of opposition (No. 91232560 (the "'560 Opposition")) against HCI's application.

The Board instituted this concurrent use proceeding and allowed HL time to file an answer pursuant to Trademark Rule 2.99(d)(2), 37 C.F.R. § 2.99(d)(2).[3] In the institution order, the Board dismissed the '560 Opposition proceeding without prejudice in favor of this concurrent use proceeding, thus leaving the question of HCI's entitlement, if any, to a concurrent registration to be decided in this concurrent use proceeding. *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1113.01 (2019) ("When an opposition to a concurrent use application is filed by a party specified in the application as an exception to applicant's claim of exclusive use, the opposition may be dismissed without prejudice in favor of a concurrent use proceeding. This action may be taken by the Board upon its own initiative, or upon motion. . .") (footnote omitted).

In its answer to the notice instituting this proceeding, HL claimed ownership of the application Serial No. 86644350 seeking a geographically-unrestricted registration of the mark HANSCOMB in standard characters on the Principal

---

[3] 1 TTABVUE.

Register in connection with services identical to those recited in HCI's application.[4]

HL also alleges in its answer that it "offers a wide variety of the same type of services as [HCI] throughout the United States and is well-known among the relevant public"[5] and that "use of the mark sought to be registered by [HCI] is likely to cause confusion or mistake in the minds of purchasers … to the damage and injury of the purchasing public, and to the damage and injury of [HL] and its goodwill in the HANSCOMB word mark."[6]

## I.    The Record and Evidentiary Objections

The files of HCI's concurrent-use application and HL's unrestricted application are automatically part of the record. *See* Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1).

The Board granted the parties' stipulation to treat the discovery responses and documents they produced in response to discovery requests in a second prior, and also now-terminated, Board proceeding between the parties (Opposition No. 91216132 or "'132 Opposition"[7]), as discovery responses and documents produced in response to discovery requests in this proceeding.[8] However, the parties were informed that the "discovery responses and document production from Opposition No. 91216132 only

---

[4] 3 TTABVUE.

[5] 3 TTABVUE 3; ¶ 5.

[6] *Id.* at 18; ¶ 27.

[7] The '132 Opposition was brought by HL against a different unrestricted application by HCI for the mark now the subject of the involved concurrent-use application.

[8] 4 TTABVUE (Stipulation) and 5 TTABVUE (Board order approving the stipulation).

will become part of the record in this case if properly submitted in compliance with the Board's rules."[9]

During their assigned trial periods, the parties filed copies of deposition testimony transcripts and testimonial declarations, with related exhibits. Some of the testimony and exhibits have been designated "confidential." In addition, both parties submitted various materials, including their own responses to discovery requests propounded by the other party either in connection with this concurrent use proceeding or from the '132 Opposition. Neither party objected to the admissibility of these materials based on the manner of their introduction, including any objection based on the general bar against a party introducing its own discovery responses. *See* Trademark Rule 2.120(k), 37 C.F.R. § 2.120(k); TBMP § 704.10 ("Ordinarily, an answer to an interrogatory, or an admission to a request for admission, may be submitted and made part of the record by only the inquiring party."). In view of both parties' similar conduct in this matter, any possible objection regarding the way this evidence was submitted is waived.

HCI objected to certain testimony, and related exhibits, submitted by HL.[10] For the most part, the objections go to the weight or probative value of the witnesses' testimony and the accompanying material. We find no reason or need to exclude any of the objected-to testimony and materials outright, but make note of our ability to weigh, assuming any weight is given, all of the evidence appropriately. The

---

[9] 5 TTABVUE 2.

[10] 51 TTABVUE 54-83.

Board ultimately is "capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations, and this precludes the need to strike the testimony and evidence." *Shael Norris v. PAVE: Promoting Awareness, Victim Empowerment*, 2019 USPQ2d 370880, 2 (TTAB 2019) (quoting *Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1737 (TTAB 2014)). For example, to the extent HL's testimony submissions include the witnesses opining as to the ultimate issue of whether a likelihood of confusion exists, such opinions are accorded little or no value. HCI's objection to that testimony is noted, but it is unnecessary to exclude such testimony, as the Board has long held that the opinions of witnesses, even those of experts, cannot serve as a substitute for our own judgment with regard to whether a likelihood of confusion exists. *Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC*, 124 USPQ2d 1184, 1190 (TTAB 2017)*; Edwards Lifesciences Corp. v. Vigilanz Corp.,* 94 USPQ2d 1399, 1401-1402 (TTAB 2010) ("[T]he Board is responsible for determining whether the marks are similar, and we will not substitute the opinion of a witness, even an expert witness, for our evaluation of the facts.") (citing *Mennen Co. v. Yamanouchi Pharma. Co.,* 203 USPQ 302, 305 (TTAB 1979) (holding the "opinions of witnesses, including those qualified as expert witnesses, on the question of likelihood of confusion are entitled to little if any weight and should not be substituted for the opinion of the tribunal charged with the responsibility for the ultimate opinion on the question.")). HCI's objections to testimony regarding HL's use of its mark in commerce based on a purported lack of specificity with regard to use dates, sales numbers, etc., also go to weight rather than

admissibility and have been considered by the Board in determining what probative value, if any, should be attributed to that testimony.

## II.    Effect of Board's Decision in '132 Opposition

In the '132 Opposition between the parties, HCI sought an unrestricted registration for the same mark and services, and HL opposed that application based on its claim of priority and a likelihood of confusion. HL's opposition was sustained, and final judgment was entered against HCI pursuant to Trademark Rule 2.135, 37 C.F.R. § 2.135 (abandonment of an application after commencement of a Board proceeding).[11] Thus, "[w]ith respect to the issue of likelihood of confusion, [the] entry of judgment in the ['132 Opposition] where applicant sought an unrestricted registration and the Board's sustaining of that opposition settle the issue of likelihood of confusion where the parties use their respective marks to identify their respective services in the same geographic areas." *Over the Rainbow, Ltd. v. Over the Rainbow, Inc.*, 227 USPQ 879, 882-83 (TTAB 1985). In other words, the '132 Opposition prevents consideration of any assertion by either party that no likelihood of confusion exists based on the parties' use of their marks in overlapping geographic areas.[12]

---

[11] 25 TTABVUE (Opposition No. 91216132).

[12] For claim preclusion to apply, there must be (1) an identity of parties or their privies; (2) a final judgment on the merits of the prior claim; and (3) the second claim must be based on the same transactional facts as the first and should have been litigated in the prior case. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327 n.5 (1979); *Jet Inc. v. Sewage Aeration Sys.,* 223 F.3d 1360, 55 USPQ2d 1854, 1856 (Fed. Cir. 2000).

## III. Applicable Law – Concurrent Use

Concurrent use proceedings are governed by Section 2(d) of the Trademark Act, which provides in pertinent part:

> That if the Director determines that confusion, mistake, or deception is not likely to result from the continued use by more than one person of the same or similar marks under conditions and limitations as to the mode or place of use of the marks or the goods on or in connection with which such marks are used, concurrent registrations may be issued to such persons when they have become entitled to use such marks as a result of their concurrent lawful use in commerce prior to … the earliest of the filing dates of the applications pending or of any registration issued under this chapter …. In issuing concurrent registrations, the Director shall prescribe conditions and limitations as to the mode or place of use of the mark or the goods on or in connection with which such mark is registered to the respective persons.

15 U.S.C. § 1052(d).

HCI is in the position of plaintiff in this concurrent use proceeding and thus bears the burden of proving it is entitled to a concurrent use registration by a preponderance of the evidence. *Stawski v. Lawson*, 129 USPQ2d 1036 (TTAB 2018), *appeal dismissed*, No. 19-1617 (Fed. Cir. Dec. 19, 2019); *see also Turdin v. Trilobite, Ltd.,* 109 USPQ2d 1473, 1478 (TTAB 2014); Trademark Rules 2.99(e) and 2.116(b), 37 C.F.R. §§ 2.99(e) and 2.116(b); and TBMP § 1108. To satisfy the concurrent use provision under Section 2(d), HCI must show that: (1) it made lawful use of its mark in commerce before HL filed its application; and (2) the concurrent use of HCI's mark and HL's mark is not likely to cause confusion "under [the] conditions and limitations as to the mode or place of use of the marks" proposed in HCI's application. *See* 15 U.S.C. § 1052(d).

As to the first condition, which is jurisdictional in nature, *see, e.g.*, *Stawski*, 129 USPQ2d at 1041,we find that HCI has demonstrated by a preponderance of the evidence that it made lawful use of its mark in commerce prior to May 28, 2015, the filing date of HL's application. The record establishes that HCI first used its mark in May 2013.[13] Scott Cullen, a principal of HCI, testified that he and co-founder Martin Jacobs started their business, "Hanscomb, Inc." in early 2013,[14] and pursuant to an agreement executed in May 2013 with a third party, agreed to change the name to "Hanscomb Consulting, Inc."[15] The record also includes evidence showing HCI's use of its mark in connection with "Design Development Construction Cost Estimate" services, at least as early as June 14, 2014.[16]

## IV.    Proposed Geographic Restrictions

As discussed, HCI seeks to restrict HL's trademark rights to the zip codes of 60521 (in Hinsdale, Illinois) and 90071 (in Los Angeles, California). This restriction is a contested issue because HL, in its answer, alleges that it has used its mark

---

[13] We also note that HCI, in its brief, asserts that it first used its mark "on May 21, 2013 in association with some of the services listed in its application for registration, and by July 11, 2013 was using its mark in association with all the listed services." 51 TTABVUE 10.

[14] 14 TTABVUE 25, Cullen Dep. 21:4-6.

[15] 14 TTABVUE 38-41, Cullen Dep. 34:1-37:18. Specifically, Jacobs acted in his individual capacity and with authority to bind Hanscomb, Inc. when he entered into an agreement with Faithful+Gould, Inc. that included the provision that Hanscomb, Inc. would change its name to "Hanscomb Consulting, Inc."

[16] 14 TTABVUE 53, Cullen Dep. 49:18-20 identifying Exh. 44 ("example of a cost estimate" designated "confidential"); *see also* Cullen Dep. 60:1-6 identifying Exh. 50, and 64:2-6 identifying Exh. 51 ("complete listing of the projects that [HCI] has done since starting in March of 2013").

throughout the U.S. for many years. HL seeks a geographically unrestricted registration for its mark.

It is HCI's burden to prove that it is entitled to a registration for its proposed geographical territory, and that HL's territory should be restricted accordingly, and that these restrictions will avoid a likelihood of confusion, mistake or deception based on the parties' concurrent use of their marks. "The starting point for any determination as to the extent to which the registrations are to be territorially restricted should be the conclusion that the prior user is prima facie entitled to a registration covering the entire United States." *In re Beatrice Foods Co.*, 429 F.2d 466, 166 USPQ 431, 436 (CCPA 1970). HL, as the excepted prior user and filer of an application for an unrestricted registration, is entitled to that presumption and HCI cannot assert registration rights for the same territory that HL has established prior use. As we have frequently pointed out, concurrent rights generally arise "where a party, in good faith and without knowledge of a prior party's use in **another geographical area**, adopts and uses the same or similar mark for the same or like goods or services **within its own geographical area** . . . without any resulting confusion as to source." *Woman's World Shops Inc. v. Lane Bryant Inc.,* 5 USPQ2d 1985, 1987-88 (TTAB 1988) (emphasis added). Accordingly, in deciding if the proposed geographic restrictions set forth in HCI's concurrent use application are warranted, we must determine the extent of HL's use of its mark prior to HCI's established use dates and whether HCI has carried its burden of proving that it is entitled to geographically restrict HL's use of its mark.

We find, based on the record before us, that HL's use of its HANSCOMB mark in connection with its services has not, as contended by HCI, been confined to the two postal area zip codes identified in HCI's application. To the contrary, we find that HL has demonstrated prior and continuous use of its HANSCOMB mark in many locations throughout the U.S.

In his trial declaration, Arthur Maw, HL's President for the past 17 years and an HL employee for 37 years, testified that HL has used its HANSCOMB mark in connection with its quantity surveying (estimating and monitoring construction contract work) services for nearly 40 years.[17] Maw specifically made the following statements:

- HL provides quantity surveying services in connection with major construction projects that are "usually above 10 million dollars" and the services include "Establishing budgets and benchmarking . . . Owner representation . . . Procurement advice . . . Construction Phase Cost Management [and] Capital Planning, etc."[18]

- HL "has performed its services for US-based companies for projects physically located in the United States . . . [and] Canada."[19]

- HL directs its services to "construction companies, architects and engineering companies involved in large construction projects . . .[,] including for example hotels, hospitals, government buildings, [and] colleges and universities."[20]

- HL used its HANSCOMB mark "in at least the following locations in the United States during the 1980's . . . Dallas, Texas . . . Ithaca, New York . . . Midland, Texas . . . New York, NY . . . Tampa, Florida . . . Boston, Massachusetts . . . Deerfield Beach, Florida . . . Fort Lauderdale, Florida . . .

---

[17] 38 TTABVUE.

[18] *Id.* (Maw Decl. ¶ 8).

[19] *Id.* at ¶ 9.

[20] *Id.* at ¶¶ 10-11.

Omaha, Nebraska . . . Hyannis, Massachusetts . . . [and] Lexington, Massachusetts."[21]

- HL used its HANSCOMB mark "in at least the following locations in the United States during the 1990's . . . Seattle, Washington . . . Deerfield Beach, Florida . . . New York, NY . . . Midland, Texas . . . Amherst, NY . . . Chicago, Illinois . . . Essex, Connecticut . . . Omaha, Nebraska . . . Englewood, Colorado . . . Dallas, Texas. . . [and other places]."[22]

- "Since the year 2000 Hanscomb Limited worked on projects in connection with U.S. customers in at least the following locations [identified by city, state, zip code]: Denver, CO 80202 . . . Cincinnati, OH 45202 . . . Portland, OR . . . Boston, MA 02210 . . . University Park, PA 16802 . . . Tucson, AZ 85704 . . . NW Washington, DC 20007 . . . Loudon County, VA . . . Carrollton, TX . . . Pasadena, CA 91105 . . . Dallas, TX 75240 . . . New York, NY 10022 . . . Englewood, CO 80112 . . . Chicago, IL 60603 . . . Madison, WI 53704-6302 . . . Buffalo, NY 14202 . . . Douglasville, PA 19518-8713 . . . San Francisco, California 94105 . . . Watertown, Massachusetts 02472 . . . Houston, Texas 77082 . . . New York, NY 10006 . . . [and 20 other locations]."[23]

- "Since 2012 Hanscomb Limited has worked on projects in <u>at least</u> the following areas: West Newton, MA 02465 . . . Boston, MA 02210 . . . Westford, MA 01886 . . . Boston, Massachusetts 02114 . . . Cambridge, MA 02142 . . . Los Angeles, CA 90031 . . . Troy, New York 12180 . . . New York, NY 10002 . . . Glen Cove, NY 11542 . . . Summerville, SC. 29485 . . . Baltimore, MD 21211."[24]

- "One of Hanscomb Limited's recent mailings to solicit business [was sent to] . . . locations in the United States where architects and construction companies and others who would use Hanscomb Limited's services . . . Examples of locations of architects, engineering firms and construction companies on the list that were solicited by Hanscomb Limited are as follows: So. Norwalk, Ct 06854 . . . Belleair, FL 33756 . . . Brookfield, CT 06804 . . . Washington, DC 20037 . . . Grand Island, NY 14072 . . . Naperville, IL 60564 . . . Devon, PA 19333 . . . Alameda, CA 94501 . . . [and 25 other locations identified by city/state/zip code]."[25]

---

[21] *Id.* at ¶ 12.

[22] *Id.* at ¶ 13.

[23] *Id.* at ¶ 14.

[24] *Id.* ¶ 15.

[25] *Id.* ¶ 16.

In addition to HL's submission of Maw's testimony by declaration, HCI introduced the transcripts of Maw's testimony by deposition taken on two different occasions, once during its initial trial period[26] and once during HCI's rebuttal period.[27] HCI had ample opportunity to question HL's principal (and employee for the last 37 years) regarding the extent of HL's use of its HANSCOMB mark in the U.S.

In his first deposition by HCI, Maw describes with more particularity the type of services HL has provided, including a construction project involving the Gordie Howe Bridge that connects Windsor, Ontario and Detroit, Michigan.[28] Specifically, Maw testified in response to questioning by HCI's counsel that HL is providing "cost planning, cost control, risk management, schedule analysis, evaluations, some value engineering, assessment of soft costs, working along with . . . a large American organization, and its numerous American architects involved with the union architects," and that these services are being rendered on the U.S. side of the bridge, as well as the Canadian side.[29] In the same deposition, Maw also testified regarding HL's services rendered in connection with the LaGuardia New York airport redevelopment.[30] In his second deposition by HCI, taken during HCI's rebuttal

---

[26] 18 TTABVUE (Maw deposition taken on May 22, 2018); 19 TTABVUE (confidential copy).

[27] 43 TTABVUE 224 et seq. (Maw deposition taken on November 6, 2018).

[28] 18 TTABVUE 48-55 (Maw Dep. 44:16-51:20).

[29] *Id.* at 54 (Maw Dep. 50:11-22).

[30] *Id.* at 19, 25, 61-63 (Maw Dep. 15:16-18; 21:7-11; 57:13-22; 58:21-59:11).

testimony period, Maw was asked by counsel for HCI about his declaration, and he

confirmed the veracity of the information regarding HL's use of its mark in the U.S.:[31]

Q. Okay. In paragraph 13 of your declaration, Exhibit 58, you describe cities in which Hanscomb Limited used its Hanscomb trademark, as you describe it, allegedly in the 1990s. You list what looks to be a couple dozen different cities.

A. Yes.

Q. And do you know what services were being performed in those cities in the 1990s?

A. Yeah, it would have been primarily cost planning and cost control.

. . .

Q. And then in paragraph 14 you list a number of cities in which Hanscomb Limited worked on projects in connection with U.S. customers and it looks to be several dozen additional cities.

A. Yep.

Q. In the 2000s, were the services well, when I say the 2000s, I gather that this is the year 2000 to the year 2011 since paragraph 15 starts with 2012. Is that correct, do you believe?

A. I would interpret it that way, yes.

Q. Yeah, okay. So do you know what services were being performed in each of these cities in paragraph 14?

A. Mainly would have been cost planning and cost control.

. . .

Q. Okay. Now, in paragraph 15 of your declaration, you list 11 cities in which Hanscomb Limited alleges, based on your declaration, it has worked on projects. Now, paragraph 15 is not accompanied by any reference to any exhibit. Do you know what the dates were of those projects and what services were performed in each project in paragraph 15?

---

[31] 43 TTABVUE 224, 265-266, 272 (Maw Dep. 42:6-15; 42:24-43:15; and 49:1-21).

A. I do not know the dates of the references on those. Some of the projects would fall into a time period that some of them I think I know what they are, and the services would have been primarily cost planning and cost control services. It could have been scheduling. It could have been value engineering.

Q. Any project management?

A. No, we traditionally don't do very much of that.

Q. Okay.

A. Or construction management.

In addition to Maw, HL produced other witnesses who were able to elaborate upon or corroborate HL's activities throughout the U.S. over the years. For example, Kenneth E. King, a manager at HL's Vancouver office, who provided a testimonial declaration and oral deposition testimony, testified that he made presentations in 2012 (in Utah) and 2014 (in Fresno, California) on behalf of HL to attendees who included architects, engineers and construction company personnel.[32] King answered questions from HCI's counsel regarding his testimonial declaration:[33]

Q. So, then paragraph 7 says that, "in my position at Hanscomb Limited, I have dealt with architects in Salt Lake City and Seattle, Washington for Hanscomb. I have also worked with construction companies in Salt Lake City and San Francisco, California." Do I have that right?

A. You do.

Q. So, let's first ask about the architects in Salt Lake City and Seattle, Washington. Do you know when that occurred?

A. I am currently still dealing with both. It occurred starting in 2012, especially for the one in Salt Lake City. The one in Seattle would have occurred in 2014 when I started dealing with them. I continue to work with architects in Salt Lake City. We are looking at a number of potential opportunities in that regard.

---

[32] 36 TTABVUE (King Declaration); 43 TTABVUE 174-176 (King Deposition at 12:12-14:9).

[33] 43 TTABVUE 177-178 (King Dep. at 15:13-16:22).

Q. Has Hanscomb Limited performed any services for these architects in Salt Lake City and Seattle?

A. We have performed pro bono services, very high level feasibility studies, analyses for projects that we are hoping will materialize into a full project.

Q. That started in 2012 and 2014?

A. No, that started with Salt Lake City in 2012, and has continued ever since. We had numerous -- I have had numerous reviews of projects that they are looking at. We have been giving some guidance on a pro bono basis with understanding that, when they come to fruition, we will be engaged formally.

Based on the entire record, and particularly the aforementioned evidence, we find that HCI is not entitled to registration of its mark in the territory it seeks by way of its concurrent use application. *Over the Rainbow, Ltd. v. Over the Rainbow, Inc.*, 227 USPQ 879, 884 (TTAB 1985) (primary concern in concurrent use proceeding is the avoidance of likelihood of confusion; applicant unable to establish its entitlement to registration in area claimed where senior user was national franchise). That is, the evidence establishes that HL's prior and continuous use of its HANSCOMB mark has not been geographically limited to the two zip codes listed in HCI's concurrent use statement. This finding of fact invalidates HCI's proposed geographic restriction on the use of HL's mark in connection with the services. *Cf. Pinocchio's Pizza Inc. v. Sandra Inc.*, 11 USPQ2d 1227, 1229 (TTAB 1989) (as a general rule prior user is entitled to registration covering entire U.S. except for geographic area in which subsequent user has actually used the mark plus an area shown to be within the natural expansion of its business, but rule is not absolute); *Ole' Taco Inc. v. Tacos Ole, Inc.*, 221 USPQ 912, 915 (TTAB 1984).

In making our factual findings based on the record, we have kept in mind HCI's evidentiary objections. Particularly, we note that HCI moved to strike "paragraphs 12, 13, 14 and 15 of Mr. Maw's declaration, which paragraphs list cities where Mr. Maw alleges Defendant has allegedly used its mark," on the basis that Maw did not state the "dates of use" or "what services were provided" and thus "these paragraphs are irrelevant, immaterial and nonprobative of the issues in this proceeding."[34]

While HCI is correct that Maw's declaration lacks some specificity as to the particular dates of use and services rendered for each location identified, the number of locations identified is extensive, covering many years and the work locations are roughly grouped into decades (the 1980s, 1990s, 2000-2011, and 2012-present). Moreover, counsel for HCI queried Maw regarding the very same paragraphs that it seeks to strike and Maw confirmed the accuracy of the statements in the declaration. Maw was also able to specify what services HL rendered in certain years. Accordingly, HCI's objections are not well taken; we find Maw's statements in the declaration to be probative, reliable, and corroborated by his deposition testimony, as well as the testimony of HL's other witnesses.

## V.  Conclusion

HCI has not carried its burden of proof and shown it is entitled to a concurrent registration based on the geographic limitations set forth in its application. HCI's application seeks to restrict HL's mark to only two zip codes. HL has established that it has prior rights in the mark in many more locales throughout the country than just

---

[34] 51 TTABVUE 57.

those two zip codes. Because HL has demonstrated prior use in multiple localities throughout the United States that overlap significantly with HCI's own proposed geographic territory, HCI's concurrent use application must fail. The claim of a likelihood of confusion based on the parties' use of their marks in the same geographic areas has already been decided in the affirmative in the '132 Opposition.

**Decision**:

In view of the foregoing, the Board finds HCI is not entitled to a concurrent registration for its mark. The concurrent use proceeding is therefore dissolved, and HCI's involved concurrent use application stands abandoned.